IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERCIA ) | |
| ) | Case No. 1:19-mj-457 (JFA) |
| v. ) | |
| ) | |
| KEELAN ROBERT MISKEL ) | |
| ) | |
| Defendant. ) | |

FILED OCT 23 2019 CLERK, U.S. DISTRICT COURT ALEXANDRIA, VIRGINIA

### AFFIDAVIT IN SUPPORT OF A
### CRIMINAL COMPLAINT AND ARREST WARRANT

I, Kendrah Peterson, being duly sworn, depose and state as follows:

### INTRODUCTION

1. I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since 2006. I am currently assigned to Enforcement Group Forty-Four at the Washington Division Office, located in the District of Columbia.

2. While with the DEA, I have participated in the investigation of narcotics traffickers and possessors. Many of these investigations led to the arrest and conviction of narcotics dealers and money launderers. In the course of conducting these investigations, I have used several different kinds of investigative techniques, including: interviewing informants and cooperating sources; conducting physical surveillance; conducting short-term and long-term undercover operations, including reverse undercover operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification data; conducting court-authorized electronic surveillance; preparing and executing search warrants, which have led to substantial seizures of narcotics, firearms, contraband, and drug related assets; and, the analysis of financial documents and records.



3. This affidavit is being submitted in support of a criminal complaint charging KEELAN ROBERT MISKEL ("MISKEL") with conspiracy to distribute fifty (50) grams or more of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

4. The facts and information contained in this affidavit are based upon my personal knowledge of the investigation and information obtained from other state and federal law enforcement officers. All observations not personally made by me were relayed to me by the individuals who made them or are based on my review of reports, documents, and other physical evidence obtained during the course of this investigation.

5. This affidavit contains information necessary to support probable cause. The information contained in this affidavit is not intended to include each and every fact and matter observed by me or known to the government.

6. During the course of this investigation, investigators have used three (3) cooperating sources (hereinafter, "CS-1" through "CS-3"). For purposes of this affidavit, all cooperating sources will be referred to in the masculine gender regardless of their true gender. The information provided by all of the cooperating sources has been corroborated by consensually monitored telephone calls, text messages, and other means. To my knowledge, none of the information provided by any cooperating sources has proved to be false, misleading, or inaccurate in any material respect.

7. CS-1 started cooperating with law enforcement in 2018. CS-1 is an admitted drug user and has pled guilty to a federal drug trafficking charge in the Eastern District of Virginia. CS-1 is cooperating with law enforcement in hopes of receiving credit for cooperation after pleading guilty and being sentenced for a federal drug trafficking charge. Information provided by CS-1 has

been accurate. I consider CS-1 to be reliable.

8.  CS-2 started cooperating with law enforcement in 2019. CS-2 is an admitted drug user and has no prior criminal history. CS-2 is cooperating with law enforcement in hopes of receiving credit for cooperation for a potential drug trafficking charge. Information provided by CS-2 has been accurate. I consider CS-2 to be reliable.

9.  CS-3 stared cooperating with law enforcement in 2018. CS-3 is an admitted drug user and a has prior conviction for possession with the intent to distribute methamphetamine. CS-3 is cooperating with law enforcement in hopes of receiving credit for cooperation on pending state drug charges. Information provided by CS-3 has been accurate. I consider CS-3 to be reliable.

## PROBABLE CAUSE

### Background of Investigation

10.  In approximately 2017, law enforcement officers obtained information that a group of individuals were distributing large quantities of methamphetamine throughout the Washington, D.C. Metropolitan area (WMA). This group utilized, and often shared, sources of supply for multiple-ounce quantities, and at times multiple-pound quantities, of methamphetamine, which they further distributed to customers throughout the WMA, including in the Eastern District of Virginia. Law enforcement also learned that these individuals used various mailing services (i.e. USPS, UPS, DHL, and FedEx) to ship methamphetamine to the Eastern District of Virginia and elsewhere. Law enforcement has identified KEELAN ROBERT MISKEL as part of this group.

### LAW ENFORCEMENT SEIZURE OF APPROXIMATELY TWO (2) POUNDS METHAMPHETAMINE IN ARLINGTON, VIRGINIA ON SEPTEMBER 8, 2018

11.  On or about September 8, 2018, law enforcement intercepted a FedEx package mailed from California to CS-1 at the Homewood Suites, located at 1900 North Quinn Street,

Arlington, Virginia. Law enforcement conducted a controlled delivery of the package. This resulted in an encounter with CS-1, who law enforcement detained when CS-1 attempted to obtain the package. CS-1 agreed to cooperate with law enforcement and consented to a search of the FedEx package, resulting in the discovery of suspected methamphetamine. Laboratory analysis confirmed the substance was approximately 885 grams of actual methamphetamine.

### HISTORICAL INFORMATION PROVIDED BY CS-1

12. CS-1 was subsequently arrested and pled guilty to federal drug trafficking charges in the Eastern District of Virginia. During the interview, CS-1 admitted to importing multiple pounds of methamphetamine from California for further distribution in the Eastern District of Virginia and elsewhere. Specifically, CS-1 admitted to providing distribution quantities of methamphetamine to several individuals including MISKEL.

13. CS-1 met MISKEL in the WMA in approximately late 2017. In late 2018, CS-1 "fronted" MISKEL approximately three (3) to four (4) ounces of methamphetamine. MISKEL agreed to pay CS-1 back at a later date. According to CS-1, MISKEL failed to satisfy the debt, after which they had no additional dealings. CS-1 admitted that in earlier deals, MISKEL paid him for methamphetamine in cash or via Square Inc. Through my involvement in this investigation, I know that Square, Inc., provides an application-based money transfer service that allows users to send money to others through their phone. The application is normally linked to a bank account or credit card.

### COMMUNICATIONS BETWEEN CS-1 AND MISKEL

14. CS-1 allowed law enforcement to search his cellular phones. This revealed communications corroborating CS-1's statements that he conspired with MISKEL to distribute methamphetamine. CS-1 communicated with MISKEL, who utilized phone number 703-303-

9959. The following table identifies communications between CS-1 and MISKEL regarding the purchase of methamphetamine.

| DATE | FROM | MESSAGE |
|---|---|---|
| 08/11/18 | MISKEL | Well this is the deal. I had two people back out which cost me 375. Then two people that were going to buy have decided to go to rehab today! And one guy who is looking to purchase had his dog die yesterday so he is in a ny quill comma and now I'm on an Uber with a drunk driver and I feel we are going to die. Tonight sucked and you stuck your neck out for me. And I failed. Once again I'm sorry I wasted your time. I tried really hard. With this leech on me, grabbing money out of my account. It's hard to hold on to money. And none of this is your problem. It's mine. Allow me sometime to fix it. All forces were against me tonight. |
| 08/11/18 | MISKEL | Not so quick. My night was super hectic. I couldn't get into my hotel room till 3 am cause I was short 27 bucks. I had such a headache from the heat I went right to sleep. I woke not to long ago. I have a somebody here purchasing Girl Scout cookies. I'll be done with it here in a moment. I'll send you the proceeds. |
| 08/11/18 | CS-1 | WHERE THE FUCK IS THE MONEY |
| 08/11/18 | CS-1 | Don't call me again. Keep the money and the dope. Lord knows you need it, very bad. |

15. Through my knowledge of this investigation and discussions with CS-1, I believe that in the above messages, CS-1 and MISKEL are discussing methamphetamine that had been "fronted" by CS-1, and MISKEL's failure to pay for it.

### HISTORICAL INFORMATION PROVIDED BY CS-2

16. In 2018, law enforcement approached a subject identified through the phone download of CS-1. This subject agreed to cooperate and provided information relevant to this ongoing methamphetamine trafficking investigation. The subject, hereinafter referred to as CS-2, bought and sold distribution quantities of methamphetamine with MISKEL.

17. In 2018, CS-2 supplied MISKEL with "8-ball" and other quantities of methamphetamine. From my training and experience, I know that an "8-ball" is approximately

5

3.5 grams. During 2018, CS-2 also purchased at least one (1) "8-ball" from MISKEL. According to CS-2, MISKEL used two (2) cellular phone numbers, 703-303-9959 and 703-220-6053.

## LAW ENFORCEMENT SEIZURE OF METHAMPHETAMINE FROM CS-3 ON OCTOBER 2, 2018

18. On or about October 2, 2018, in Arlington, Virginia, law enforcement encountered an individual in possession of suspected methamphetamine, packaging materials, and scales. The subject, hereinafter referred to as CS-3, was arrested and agreed to cooperate with law enforcement in hopes of receiving favorable consideration for his pending charge.

19. When CS-3 was arrested, the approximate weight of the substance seized from him was 66.3 grams. A portion of that substance was later analyzed by the Commonwealth of Virginia Department of Forensic Science and was confirmed to be methamphetamine weighing 4.30 grams.

## HISTORICAL INFORMATION PROVIDED BY CS-3

20. CS-3 met MISKEL through a social-networking / dating application on his phone (either "Grindr", "Scruff", or "A4A"). He began to purchase "8-ball" quantities of methamphetamine from MISKEL on a regular basis. According to CS-3, these transactions usually occurred at hotels or at MISKEL's residence in Arlington, Virginia. CS-3 developed a business relationship with MISKEL in which he was "fronted" quantities of methamphetamine for further distribution.

21. MISKEL told CS-3 that he was receiving two (2) to three (3) ounces of methamphetamine on a regular basis from several sources of supply, including a subject named "Mike" in Maryland. CS-3 paid MISKEL both in cash and through Square Inc. for methamphetamine. CS-3 identified the Square Inc. account name for MISKEL as "keelanmiskel". CS-3 stated that most, if not all, of his Square Inc. transactions with MISKEL were payments for methamphetamine.

## LAW ENFORCEMENT SEIZURE OF METHAMPHETAMINE FROM MISKEL ON OCTOBER 22, 2018

22. On or about October 22, 2018, in the District of Columbia., law enforcement responded to The Fairmont Hotel, located at 2401 M Street N.W., Washington, D.C., based on a report of drug use in room #532. Before law enforcement's arrival, hotel security encountered two (2) subjects and observed suspected drug paraphernalia in plain view. The two (2) subjects were escorted from the room. Shortly thereafter, hotel security learned that MISKEL was also staying in the room. They allowed him back in to retrieve his personal items and he unlocked the room safe. When MISKEL opened the safe, security observed suspected methamphetamine and Gamma Hydroxybutyrate (GHB). Law enforcement seized the suspected narcotics. The suspected methamphetamine was submitted to the District of Columbia Department of Forensic Sciences, which confirmed the substance was methamphetamine with a net weight of 39.41 grams.

## LAW ENFORCEMENT SEIZURE OF METHAMPHETAMINE FROM MISKEL ON MARCH 2, 2019

23. On or about March 2, 2019, law enforcement officers responded to a trespassing complaint at the Crystal City Gateway Marriot, located at 1700 Jefferson Davis Highway, Arlington, Virginia. Upon arrival, officers encountered MISKEL, who had been banned from all Marriot properties following the incident described in paragraph 22 of this affidavit. When the officer encountered MISKEL in Room 1767, they observed suspected drug paraphernalia in plain view. Law enforcement obtained a search warrant for the room resulting in the seizure of suspected methamphetamine. The suspected methamphetamine was submitted to the Drug Enforcement Administration Mid-Atlantic Laboratory. That analysis confirmed the substance was 14.465 grams of methamphetamine.

## POST-ARREST STATEMENT OF MISKEL

24. On or about March 2, 2019, law enforcement questioned MISKEL after advising him of his rights against self-incrimination. MISKEL agreed to be interviewed. MISKEL initially denied being involved in the distribution of methamphetamine, but later admitted that CS-1 had been his supplier.

## DOWNLOAD OF MISKEL'S PHONE

25. Also on or about March 2, 2019, MISKEL permitted law enforcement to download the contents of his cellular phone. That extraction resulted in the discovery of numerous suspected drug-related messages, photographs of suspected methamphetamine, and mailing service tracking numbers.

## COMMUNICATIONS BETWEEN CS-3 AND MISKEL

26. The following table identifies communications between CS-1 and MISKEL regarding the purchase of methamphetamine.

| DATE | FROM | MESSAGE |
|---|---|---|
| 09/05/18 | CS-3 | Hi Keelan, this is [CS-3's name], how much would you do an ounce or 2 for? |
| 09/05/18 | MISKEL | Well I'm not selling ounces at the moment. I would sell a half ounce or two. For 600 each. |
| 09/05/18 | MISKEL | But I would have to get to know the people. No third party sells. No, I want to keep my identity secret, situations. Full disclose on the information. And maybe when I set my next package I would see about selling an ounce or two to that person.. |

27. Through my knowledge of this investigation and discussions with CS-3, I believe that in the above messages, MISKEL and CS-3 are discussing the purchase of ½ an ounce quantity of methamphetamine. The conversation also discusses MISKEL discussing picking up a "package", which I believe to be a re-supply of methamphetamine.

## DRUG-RELATED COMMUNICATIONS FROM MISKEL PHONE DOWNLOAD

28. The following exchange took place between MISKEL and an unindicted co-conspirator (UCC-1):

| DATE | FROM | MESSAGE |
|---|---|---|
| 01/08/17 | UCC-1 | Why do you only want to at early hours of the morning? |
| 01/08/17 | MISKEL | Because this is my schedule |
| 01/08/17 | MISKEL | I'm a. Drug dealer for goodness sake |
| 01/08/17 | MISKEL | I sleep in the day and I work at night. |

29. The following exchange took place between MISKEL and an additional unindicted co-conspirator (UCC-2):

| DATE | FROM | MESSAGE |
|---|---|---|
| 08/16/18 | MISKEL | Ok. I think I can make it up there. Me and a friend will be renting a vehicle. Just to settle it all up…I'll be getting what for how much? And you said the quality was mediocre? What should I expect? |
| 08/16/18 | UCC-2 | So 30 grams for 1000. And year I'm not going to lie to you and tell you it's super fire but it also isn't garbage. In terms of people I have hooked up one person said they didn't like it while 4 or 5 texted and told me explicitly they really liked it the rest said nothing either way. |
| 08/16/18 | MISKEL | Ok look like…will it all be small shards, big rocks or nearly all dust? |
| 08/16/18 | MISKEL | What will it look like I mean. If you could send a pic that would be awesome. If not I understand. |
| 08/16/18 | MISKEL | Someone else is investing with me. So he has to be convinced. |
| 08/16/18 | UCC-2 | Some of it I already had bagged and weighed. |
| 08/16/18 | UCC-2 | There's some shake obviously but not a lot |
| 08/16/18 | UCC-2 | I will get it all into one bag |
| 08/16/18 | MISKEL | When he gets here then we will leave. We have to order the car when he gets here. So once we get that all settled. I can shoot you a time. Cool? |
| 08/16/18 | MISKEL | We are coming |

9

| 08/16/18 | UCC-2 | Equals 32 even. |

30. Through my knowledge of this investigation, I believe that in the above messages, MISKEL and UCC-2 are discussing the purchase of 32 grams of methamphetamine. MISKEL told UCC-2 that he has another co-conspirator investing in the purchase.

31. The following exchange took place between MISKEL and an additional unindicted co-conspirator (UCC-3):

| DATE | FROM | MESSAGE |
|---|---|---|
| 09/01/18 | MISKEL | That's fine Rasmus. You said you would get this no worries. I guess I sort of depended on you to get this. You don't understand…the longer I have it the more liability it creates. Getting rid of it as soon as possible is the name of the game. To get caught with this much could be disastrous. Hello!? And it is pretty damn good shit. Best stuff around. |
| 09/01/18 | MISKEL | No one is freaking out. But I do have nearly four ounces in my possession, with a week to transfer enough of it into cash for my supplier to be wow'ed by my sales and send half pounds. Which changes everything. |
| 09/01/18 | MISKEL | I have goals. And I'm really just wanting you to purchase because I'm out here. |
| 09/01/18 | MISKEL | Yes it will. Because I can send it to him to make my first payment under 24 hrs. I beg to differ. It makes all the difference. |

32. Through my knowledge of this investigation, I believe that in the above messages, MISKEL and UCC-3 are discussing MISKEL's possession of four (4) ounces of methamphetamine. MISKEL further claims that he intends to receive shipments of ½ pound quantities of methamphetamine from this source of supply.

33. The following exchange took place between MISKEL and UCC-2:

| DATE | FROM | MESSAGE |
|---|---|---|
| 01/27/19 | MISKEL | You got a half pound? |
| 01/17/19 | UCC-2 | On me? No |

10

| 01/27/19 | UCC-2 | I got maybe 3 and a half ounce |
| --- | --- | --- |
| 01/27/19 | MISKEL | How much to let the whole jank go? |
| 01/27/19 | MISKEL | My local is intetedfed.. |
| 01/27/19 | MISKEL | Interested |
| 01/27/19 | UCC-2 | 84 grams 2 bottles Viagra 2k even. 65-70 of that in a single shard |
| 01/27/19 | UCC-2 | [image of substance] |

34. Through my knowledge of this investigation, I believe that in the above messages, MISKEL and UCC-2 discussed MISKEL's attempt to broker the purchase of ½ pound of methamphetamine from UCC-2. UCC-2 related that he only is currently in possession of approximately 3.5 ounces.

35. The following exchange took place between MISKEL and UCC-2:

| DATE | FROM | MESSAGE |
| --- | --- | --- |
| 02/19/19 | UCC-2 | So tell your dude who wants the qp I have it right now if he decides to snag it. Let him know also that I won't have it much longer ya know |
| 02/19/19 | UCC-2 | And I gave you wrong price earlier. Did my math wrong. 800 an ounce times 4 oz is 3200. I will take 3k |
| 02/19/19 | MISKEL | I have not relayed anything to him as of yet. |
| 02/19/19 | UCC-2 | Ok good deal. Just wanted to make sure you had correct number |
| 02/19/19 | UCC-2 | Whenever you do talk to him bout it lemme know what he says cuz if we can make it happen there's room in there for you to make some money for yourself also |

36. Through my knowledge of this investigation, I believe that in the above table of messages, MISKEL and UCC-2 are discussing MISKEL attempting to "broker" the purchase of 1/4 pound of methamphetamine from UCC-2. UCC-2 related the price and the opportunity for MISKEL to profit off of the sale.

37. The following handwritten table was also found within the images from the phone download:



## BUSINESS RECORDS OBTAINED FROM SQUARE INC.

38. Law enforcement subpoenaed business records from Square Inc. for accounts associated with MISKEL. The records indicated that MISKEL had several user/cashtag names, which included "k.r.miskel", "keelanmiskel", and "krmbiz".

## SQUARE INC. TRANSACTIONS OF MISKEL

39. The following table shows transactions between MISKEL and CS-1:

| DATE | SENDER | RECEIVER | AMOUNT |
| --- | --- | --- | --- |

| 08/05/18 | MISKEL | CS-1 | $140 |
| --- | --- | --- | --- |
| 08/05/18 | MISKEL | CS-1 | $250 |
| 08/05/18 | MISKEL | CS-1 | $150 |
| 08/05/18 | MISKEL | CS-1 | $140 |

40. The following table shows transactions between MISKEL and CS-3:

| DATE | SENDER | RECEIVER | AMOUNT |
| --- | --- | --- | --- |
| 09/06/18 | CS-3 | MISKEL | $50 |
| 09/08/18 | CS-3 | MISKEL | $500 |
| 09/08/18 | CS-3 | MISKEL | $50 |
| 09/12/18 | CS-3 | MISKEL | $350 |
| 09/19/18 | CS-3 | MISKEL | $850 |
| 09/27/18 | CS-3 | MISKEL | $80 |

41. The following table shows transactions between MISKEL and UCC-2:

| DATE | SENDER | RECEIVER | AMOUNT |
| --- | --- | --- | --- |
| 09/08/18 | MISKEL | UCC-2 | $300 |
| 09/13/18 | MISKEL | UCC-2 | $700 |
| 09/15/18 | MISKEL | UCC-2 | $200 |
| 09/20/18 | MISKEL | UCC-2 | $500 |
| 09/22/18 | MISKEL | UCC-2 | $100 |

13

| Date | Name | UCC | Amount |
|---|---|---|---|
| 09/24/18 | MISKEL | UCC-2 | $100 |
| 09/25/18 | MISKEL | UCC-2 | $65 |
| 09/30/18 | MISKEL | UCC-2 | $525 |
| 10/02/18 | MISKEL | UCC-2 | $105 |
| 10/03/18 | MISKEL | UCC-2 | $46 |
| 10/04/18 | MISKEL | UCC-2 | $30 |
| 10/15/18 | MISKEL | UCC-2 | $60 |
| 10/16/18 | MISKEL | UCC-2 | $50 |
| 10/19/18 | MISKEL | UCC-2 | $150 |
| 10/21/18 | MISKEL | UCC-2 | $320 |
| 10/22/18 | MISKEL | UCC-2 | $200 |
| 11/01/18 | MISKEL | UCC-2 | $300 |
| 11/06/18 | MISKEL | UCC-2 | $300 |
| 11/07/18 | MISKEL | UCC-2 | $150 |
| 11/08/18 | MISKEL | UCC-2 | $260 |
| 11/10/18 | MISKEL | UCC-2 | $300 |
| 11/14/18 | MISKEL | UCC-2 | $900 |
| 11/16/18 | MISKEL | UCC-2 | $100 |

## LAW ENFORCEMENT SEIZURE OF METHAMPHETAMINE ON OCTOBER 22, 2019

42. On or about October 22, 2019, law enforcement conducted a stop of MISKEL at

Union Station, located in Washington, D.C. after he disembarked a train that he had taken from Philadelphia, Pennsylvania. During a search incident to his arrest law enforcement discovered a plastic bag with approximately two (2) grams of suspected crystal methamphetamine and a digital scale with suspected crystal methamphetamine residue. MISKEL later told law enforcement officers that the substance was methamphetamine.

### POST-ARREST STATEMENT OF MISKEL

43. On or about October 22, 2019, law enforcement questioned MISKEL after advising him of his rights against self-incrimination. MISKEL agreed to be interviewed. MISKEL again made statements admitting his involvement in the distribution of methamphetamine and confirmed that he had utilized several sources of supply over the past several years. He further admitted that he retained the same customer base throughout the period of the alleged conspiracy.

## **CONCLUSION**

44. Based upon the foregoing, I believe probable cause exists that from in and around At least the end of 2017 to October 22, 2019, within the Eastern District of Virginia and elsewhere, KEELAN ROBERT MISKEL, did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with others, both known and unknown, to unlawfully, knowingly, and intentionally distribute fifty (50) grams or more of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and 846.

Kendrah Peterson
Special Agent
Drug Enforcement Administration

Sworn and subscribed to before me the 23rd day of October 2019.

_____/s/_____
John F. Anderson
United States Magistrate Judge
The Honorable John F. Anderson
United States Magistrate Judge